MARY E. BAXTER v. COVENANT MUTUAL LIFE ASSOCIATION.

June 21, 1899.

Nos. 11,665—(151).

**Life Insurance—Verdict not Sustained by Evidence—Discretion of Court.**

*Held*, that the great preponderance of evidence is so manifestly and palpably against the verdict in this case that the trial court abused its discretion in not granting a new trial.

Action in the district court for Hennepin county to recover $2,500 on a policy of life insurance. The case was tried before Elliott, J., and a jury, which rendered a verdict in favor of plaintiff for the amount demanded. From an order denying a motion for a new trial, defendant appealed. Reversed.

*L. W. Gammons*, for appellant.

*F. H. Ayers*, for respondent.

BUCK, J.

The defendant is a life insurance company, incorporated and organized under the laws of the state of Illinois, and had authority to transact life insurance business in the state of Minnesota. On July 31, 1883, it duly issued and delivered to one John A. Baxter its policy of insurance in writing, and thereby insured the life of said John A. Baxter in favor of his wife, Mary E. Baxter, this plaintiff, in the sum of $2,500, and soon thereafter said John A. Baxter delivered said policy to plaintiff, who then became, and ever since has been, the owner and holder of said policy.

It is alleged in the complaint that somewhere between February 25, 1897, and March 12, 1898, said John A. Baxter died in the county of Wilkin, in this state, but that this plaintiff first became apprised and acquired knowledge of the death of said John A. Baxter about March 12, 1898. It is also alleged that said John A. Baxter performed and did everything necessary to keep said insurance policy in full force up to the time of his death, and that defendant was duly apprised of his death, and all necessary steps were taken by the plaintiff to entitle her to the said insurance money of $2,500, which she demanded of defendant, and it refused to pay the same. The death of John A. Baxter was put in issue by the answer of the defendant, and that was the principal issue litigated on the trial before a jury, and it found a verdict in favor of plaintiff in the sum of $2,500. At the close of the testimony, the defendant moved the court to direct the jury to return a verdict in favor of the defendant upon the ground of the insufficiency of the evidence to warrant a verdict, which motion was denied, and defendant excepted. A motion to set aside the verdict and for a new trial was made by the defendant, and denied by the court, and defendant appeals.

There are no questions of law of sufficient merit to need discussion, and all issues of fact were eliminated by an agreement of counsel, save one, viz. was the body of a certain person found dead that of the insured, John A. Baxter?

It appears that for several years prior to February 25, 1897, while

77 M.—6

John A. Baxter held this policy of insurance, he lived in the city of Minneapolis, with his wife, the plaintiff herein, and their child. For a long time prior to the last-named date he had been out of work, and was financially embarrassed and despondent, and made arrangements to leave his home, in Minneapolis, stating that he was going to Black Hills, South Dakota, to look for work. He had no money, and his wife borrowed $57 for him. He also arranged to go as far south as Burlington, Iowa, having in charge during said trip some cars of potatoes belonging to a Mr. Healey, of Minneapolis. His duties were to attend the fires, and keep the potatoes from freezing, and for this he received free transportation. On February 25, 1897, Baxter went to St. Paul to take charge of these potatoes, but when he arrived there he telegraphed Mr. Healey that they had not arrived. Just when he went from St. Paul does not clearly appear, although it does appear that some one kept the fires in the cars, as the potatoes went through all right.

He did not communicate with his family after that date, and on February 11, 1898, Mrs. Baxter, plaintiff herein, filed sworn proof of his death with the defendant company, wherein she stated that Baxter was dead, that he died of Bright's disease, and gave the names of two physicians, who resided in Minneapolis, whom he had consulted, and who prescribed for him in his last illness.

In March, 1898, the badly-decomposed remains of a man were found near Breckenridge, in this state. A coroner's inquest was held over the body so found, and notice of the finding thereof came to plaintiff's knowledge through newspapers published in Minneapolis. An extract from the newspaper, which was pasted upon a letter written by Mrs. Baxter to the coroner at Breckenridge on March 13, 1898, states that

"The badly-decomposed body of a man was found in the woods north of town [Breckenridge] this afternoon, the discovery being made by a trapper. The coroner estimates that the body has lain there for a year or more, and identification is almost impossible. No money was found on the body, but there was a pipe marked 'M. B.,' and a small note book, which was water soaked and frozen; it is being thawed out, and may throw some light on the man's identity."

In the letter Mrs. Baxter states that her husband started for

Deadwood about one year before, and could not be found, although every effort was being made by her and friends to find him; that he was out of health; that he had an insurance, which would be of no use unless she could prove death. On March 14, 1898, the coroner answered the letter, and requested a description of her husband's clothes, size and kind of shoes, knife, comb, hat, vest, pants, teeth, size of head, and his height. She answered, saying that her husband wore a Stetson hat; dark suit of clothes; that he was six feet two inches tall in his stocking feet; long, slim hand; some of his teeth gone; gold ring on his finger; laced shoes, but nearly gone; black sateen shirt and dark tie. The plaintiff's attorney also immediately answered the letter, and stated that Mrs. Baxter had just called, and stated, among other things, that most of. Mr. Baxter's teeth were gone, and especially the front ones; that he carried a short, black pocket comb; and that he carried a large wood pipe, with M. B. carved on it.

About March 19, 1898, she went to Breckenridge, where she saw the articles that were found on the body. Upon her return to Minneapolis, and on April 4, 1898, she made a second proof of death, in which she stated, under oath, that her husband died about April 15, 1897, at Breckenridge, Minnesota, and that she did not know the cause of his death, and she claimed that the body found at Breckenridge was that of her husband, John A. Baxter. After investigation, the insurance company concluded that the body found was not that of John A. Baxter, and, the proof being unsatisfactory, it declined to pay the claim, and suit therefor was instituted August, 1898, and tried October 10, 1898. As the order of the trial court denying defendant's motion for a new trial must be reversed, it is proper that we should review the evidence, and state the grounds for such reversal.

Taking up the physical characteristics first, we find that the witness Cady was a fellow workman with Baxter in 1896, and testified as follows:

"Q. Did you ever notice his feet? A. Yes, sir. Q. Do you know what size of shoes he wore? A. Yes, sir. Q. What size did he wear? A. Elevens. Q. Will you state how you know in regard to that? A. Why, Baxter and I needed shoes about the same time,

so we went up to a store, there in Harris, and Mr. Baxter got an eleven shoe, and I sent to town for mine; they didn't have just what I wanted. Q. Were you with him when he bought the shoes? A. I was with him when he bought the shoes. Q. What size shoe do you wear? A. Eight and a half. Q. Well, at that time did you notice and compare Mr. Baxter's foot with yours as to size? A. Yes; I laughed about it at the time, and made some remark about big feet."

The witness Sewall testified that Baxter wore a shoe larger than his own, which was No. 9; that he had compared the shoes, and he thought Baxter's shoes were between 10 and 12. The witness Blandin testified that he wore a No. 10 shoe, and that Baxter's was about a size or so smaller. A witness for plaintiff testified that Baxter had big feet. Mrs. Baxter did not know the size of his feet nor size of shoes he wore, but testified that they were small for a man of his size and height. Another of plaintiff's witnesses thought his feet were not as large as No. 10. These were all the witnesses who testified as to the size of Baxter's feet. Now, upon the feet of the dead body were found shoes not larger than No. 7, and one witness testified that they were about No. 6. In order to determine definitely the size of the foot of the body found, it was exhumed, and a shoe taken from its foot, which was made an exhibit in the case, and returned to this court, and conceded by each party to be the identical shoe found on the foot of the deceased. It was proven that this shoe was in size No. 6½.

As to Baxter's teeth: The plaintiff wrote to the coroner that some of his teeth were out. Her attorney wrote the coroner that most of Baxter's front teeth were out. She told the coroner that the front teeth were out. She says she told her attorney that some of the teeth were out. She testified on the stand that one or two of Baxter's front teeth were out. Another witness thought one or two teeth were out of the upper jaw, and two others testify that they thought he had one tooth out. This testimony was not contradicted. The coroner, Dr. Truax, testifies that the body found had all the teeth in their natural condition; that he picked them up, and put them back into the holes in the jaws; that the teeth were all there; that there was not a solitary one gone; and that the jaws

showed that all the teeth were there at the time of death.  Dr. Hendricks testified that all the teeth had fallen out after death.

As to Baxter's height:  In his application for insurance, July 11, 1883, he stated that his height was 6 feet 2 inches.  Mrs. Baxter testified he was 6 feet 1½ or 2 inches tall.  He weighed about 187 or 190 pounds.  The body, when found, did not measure in length exceeding 5 feet 8 or 9 inches, although one witness measured the body with a spade, and, after measuring the spade, estimated the body at 5 feet 10 inches in length, and expert evidence showed that, in no event, would the body, under the circumstances, differ more than 2 inches from the life measure.  As to Baxter's age:  He was born in 1850, and was 48 years old when the body was found.  Two expert physicians testified that the body found was not that of a person above 40 years old, and one of them stated that he was not past 35 years of age.  There was considerable other evidence which tends to show that the body found was not that of Baxter.  He belonged to the Knights of Pythias and Odd Fellows, and when he left home wore a K. P. button on his coat, a three-link pin on the inside of his vest, and a ring on his left hand.  None of these things were found on the dead body.  Other evidence also appears in the record tending somewhat to support the theory that the body found was not that of Baxter, but we do not deem it necessary to recite it in detail.

As tending to show that the body found was that of Baxter, the 13-year-old son of Baxter testified that when he went away his father wore a black suit of clothes and a black sateen shirt, a black felt hat, the same kind of shoe as was found on the dead body, and that the comb found on the dead body was the same as that usually carried by his father, and that three or four months before his father went he gave him a little blank book, which he carried in his vest pocket, and that the book found on the body was just like the one he gave his father.  He also further testified as follows:

"Q. I show you this pocketknife which has been introduced in evidence, and ask you whether or not that was your father's pocketknife.  A. He had one just exactly like it.  Q. Is there anything about that—just look at it carefully—from which you can tell to a certainty that it was your father's pocketknife?  A. From the gen-

eral shape, and from the back of the large blade being hollowed out a little.   Q. Was the back of the big blade in your father's knife hollowed out like that?   A. Yes, sir.   Q. How long had he had that knife?   A. I don't know; he had had it quite a while.   Q. I will show you this pipe, and ask you if you know whether or not that was your father's pipe.   A. Yes, sir.   Q. How do you know that was your father's pipe,—by what means?   A. By the initials on the side.   Q. Whose initials are those?   A. My mother's.   Q. Who cut them on there?   A. My father.   Q. When and where? A. I don't remember just when it was, but it was in the basement of 99 South Twelfth street.   Q. Is that where you lived when he went away?   A. Yes, sir; it was in the winter before the spring when he went away.   Q. Now, do you remember that particularly? A. Yes, sir.   Q. Do you remember any conversation that was had, or any remark that was made, at the time that he carved those in there?   A. No, sir.   Q. About the room on there,—anything said about room for the letters?   A. Why, he said, when he started in— The first letter he cut was 'M,' and he made it so wide that he couldn't get the 'E' in there, and he says, 'I can only put in the M. B.'   Q. What is your mother's middle initial?   A. 'E.'   Q. Do you remember his making that statement at the time he cut those letters in there?   A. Yes, sir."

The shirt found on the dead body was black sateen, and the suit of clothes black, and the hat felt.   Mrs. Baxter, the plaintiff, testified that her husband had small feet for a large man; that when he went away he wore a blue black suit, with a fine twill; that the shoe produced looked exactly like the one he wore when he went away; that the knife looked like the one found on the body, and that she was sure that the pipe found was the one he had when he went away; that the comb he had looked like the one found; that he wore a black sateen shirt on account of his being an engineer; that the sample of cloth taken from the suit of clothes on the dead man's body was the same kind of material as her husband's clothes; and that he had a revolver when he went away.   No revolver was found on the body.

The evidence here stated presents the most salient points of the case, and much of it is seemingly more conflicting than really so in fact.   It may be true that the clothes worn by Baxter were of the same kind of material as those found on the dead body, and yet not in fact the same suit.   The same may be said of the hat, the sateen shirt, and the blank book.   The dead man may also have had a

comb and knife similar to those of Baxter's. An explanation as to the pipe may be more difficult; but, even if originally that of Baxter's, it may, in some manner unaccounted for, have come into the hands of the dead man, or plaintiff's evidence and that of her son may not be truthful. But if the shoe worn by Baxter was No. 10 or 11, and that found on the foot of the dead man was No. 6½ or 7, and Baxter's height was 6 feet 2 inches, and the dead man's only 5 feet 8 inches, or not to exceed 5 feet 10 inches, then it is unreasonable and inherently impossible to hold that the body found was that of Baxter. Upon this point the evidence is well-nigh, if not absolutely, conclusive against the plaintiff. Other evidence tended to support the defendant's theory, such as the age and teeth of Baxter.

The burden of proving the identity of the body found as that of Baxter rested upon the plaintiff. Prior to the time of making the affidavit of death upon which this suit was instituted, plaintiff made another affidavit, under oath, that Baxter had died of Bright's disease, and stated that he had it badly. The affidavit was made February 11, 1898, nearly a year after Baxter's disappearance, and before the dead body was found. The body was not found in the region to which Baxter started to go, nor in that direction, and it does not appear that he ever intended to go to Breckenridge, where the body was found.

A careful examination of all the evidence leads us to the conclusion that the preponderance of the evidence is so manifestly and palpably against the verdict that the trial court abused its discretion in not granting a new trial.

Order reversed, and a new trial granted.